## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LISA M. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3112 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lisa M. Jones appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). This matter is before this Court for a Report and Recommendation on Jones's Brief in Support of Motion for Summary Judgment (d/e 11) (Jones Motion), and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) (Commissioner Motion). For the reasons set forth below, this Court recommends that the Jones Motion should be ALLOWED, the Commissioner Motion should be DENIED, and that the decision of the

Commissioner should be REVERSED and REMANDED pursuant to sentence four of § 405(g).

## STATEMENT OF FACTS

Jones was born on October 26, 1967.  Jones graduated from college with a bachelor's degree.  She was a registered dietician.  She worked as a dietician and a food service supervisor.  She also worked as a store manager for a Sonic Drive-In restaurant.  She last worked in January 2010. Jones alleged that she became disabled on January 15, 2010.  Certified Transcript of Record of Proceedings before the Social Security Administration (d/e 9) (R.), at 46, 48, 77.  Jones suffered from major depressive disorder; personality disorder; panic disorder with agoraphobia; alcohol abuse; marijuana abuse; obesity; fibromyalgia; history of right rotator cuff tear and osteoarthritis in the right shoulder; degenerative disc disease; and status post back surgery.  R. 23.

On May 14, 2010, Jones saw Dr. Khalid Waheed, M.D., for an initial examination as a new patient.  R. 324.  Jones reported that she came to Dr. Waheed for better, stronger pain management.  She reported being in constant pain.  She reported that her hips ached and she had chronic pain in all her joints.  She reported that she had psychiatric issues, but they were well managed by medication.  She reported that she previously saw a

psychiatrist for these issues.  Dr. Waheed planned to review all her medical records before changing medications.  Dr. Waheed told Jones in the interim to go to the emergency room if her pain was bothering her.  R. 325.  That evening, Jones went to the emergency room complaining of chest pain.  R. 272-317.  She reported chest pain when she entered the emergency room.  On examination, however, she complained of back, neck, and hip pain.  The emergency room physician prescribed pain medication and an antidepressant and referred her to Dr. Waheed.  R. 279.

On May 17, 2010, Jones saw Dr. Waheed for a follow-up to her emergency room visit.  Jones reported no chest pain, but a dull aching pain all over her body.  Jones again asked for stronger pain medication.  R. 321.  Dr. Waheed prescribed Vicodin and changed her antidepressant.  R. 322.

On June 14, 2010, Jones saw Dr. Waheed.  Jones reported that her depression was doing better and her chest pain had completely resolved.  Jones reported that her generalized body aches were much better, although her lower back pain continued.  She was taking Ultram and an occasional Vicodin for pain.  Dr. Waheed continued her current medications.  R. 318-19.

On August 5, 2010, Jones saw a Certified Nurse Practitioner Kathleen Voelker, APN, CNP, for new patient evaluation.  Voelker worked

with a rheumatologist.   Dr. Waheed referred Jones to that office for evaluation.  R. 331.  Jones reported constant pain at a 7 to 9 on a scale of 1 to 10.  Jones reported her fatigue level at an 8.  Jones reported difficulty getting out of bed, walking outdoors on flat ground, bending to pick up clothes, and getting in and out of cars.  She also reported difficulty sleeping due to depression and anxiety.  On examination, Voelker found no swollen or tender joints, normal grip strength, normal range of motion in extremities, and fairly good range of motion in lower back.  Voelker found fourteen tender points.  Dr. Waheed reported a positive ANA, but antibody tests were normal.  Voelker assessed fibromyalgia, fatigue, low back pain, depression, anxiety, bipolar, OCD, and insomnia.  Voelker stated that she did not appear to have a chronic autoimmune disease.  R. 332-33.  Voelker explained nature and treatment of fibromyalgia to Jones.  Voelker prescribed a trial of Cymbalta and a sleep study.  R. 334.  The sleep study found likely psychophysiological insomnia and poor sleep hygiene, with pain as a possible factor.  R. 354.

On September 28, 2010, Jones started a course of physical therapy to address her pain and fatigue, particularly her shoulder pain.  R. 369.  The physical therapy continued until December 6, 2010.  R. 358-69.

On October 4, 2010, Jones saw state agency psychologist Dr. Frank Froman, Ed.D., for a consultative examination.  Dr. Froman diagnosed Jones with major depressive disorder, moderately severe; panic disorder with encroaching agoraphobia; generalized anxiety disorder; mixed personality disorder with obsessive and borderline features; and fibromyalgia.

Dr. Froman assigned her a Global Assessment of Functioning (GAF) score of 50.  The GAF score was a method of quantifying the overall ability of a person to function.  The American Psychiatric Association no longer uses the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16 ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").

Dr. Froman concluded, in relevant part:

CONCLUSIONS:  Lisa appears capable of performing one or two step assemblies at a competitive rate.  At a marginal but adequate level, she can still relate to co-workers and supervisors.  She is able to understand oral and written instructions and manage her own benefits.

In terms of her ability to withstand the stress associated with customary employment, if she can handle it physically, I believe that she would be able to handle it psychologically. . . .

R. 387.

On October 6, 2010, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 390-407.   Dr. Mehr opined that Jones's mental impairments imposed moderate restrictions of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. R. 400.

Dr. Mehr further opined that Jones was moderately limited in her ability to understand and remember detailed instructions to carry out detailed instructions; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in work settings.  Dr. Mehr opined that Jones had no other functional limitations.  R. 404-05.  Dr. Mehr concluded, in part:

> [S]he retains the cognitive capacity needed to remember work locations and work related procedures, and she has the capacity to understand and remember instructions for simple jobs of a routine and repetitive type.  She, in addition, retains sufficient attention and concentration to persist at and complete work activities for the period of time required in the general work force.
>
> The claimant retains the capacity for adequate pace and endurance to maintain a schedule and on time attendance, and

> to complete a normal work day and work week on a consistent basis.  She is able to perform at common minimally acceptable rates, requiring only the usual frequency and lengths of rest breaks.
>
> She retains the capacity to be aware of and self-protective of common hazards.  This woman also retains the capacity to utilize public transportation to and from a place of work or to drive an automobile to and from such a place.

R. 406.

The forms used by Dr. Mehr employed the Social Security regulation's five level scale to rate functional limitations:  none, mild, moderate, marked, and extreme.  20 C.F.R. §§ 404.1520a and 416.920a. A finding of "none" or "mild" generally meant that the functional impairment in this area was not severe "unless the evidence otherwise indicates that there is more than a minimal limitation" in the claimant's ability to perform the function at issue.  20 C.F.R. § 404.1520a(d)(1).

The findings of "moderate," "marked," or "extreme," indicated a severe impairment.  20 C.F.R. § 404.1520a(d)(2).  The three terms were used to identify the level of severe impairment.  Id.  The regulations defined that "marked" restrictions as follows:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere

> seriously with your ability to function independently,
> appropriately, effectively, and on a sustained basis.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing of Impairments,

§ 1200C.  The regulations explained further that the scale was not based

on a specific number of activities or tasks affected, "but by the nature and

overall degree of interference with function."  Id. §§ 1200C.1, 2, and 3.

On October 27, 2010, state agency physician Dr. Sandra Bilinsky,

M.D., prepared a Physical Residual Functional Capacity Assessment of

Jones.  R. 408-15.  Dr. Bilinsky opined that Jones could lift twenty pounds

occasionally and ten pounds frequently; stand and/or walk for six hours in

an eight-hour workday; and sit for about six hours in an eight-hour workday.

Dr. Bilinsky noted that the medical records showed normal grip strength

and no swollen joints.  R. 409.

Dr. Bilinsky opined that Jones could frequently climb ramps and

stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop;

and frequently kneel, crouch, and crawl.  Dr. Bilinsky noted problems with

lower back as the reason for the limitations.  R. 410.  Dr. Bilinsky opined

that Jones should avoid concentrated exposure to extreme heat.  R. 411.

Dr. Bilinsky found no other physical functional limitations.  Dr. Bilinsky

found Jones to be only partially credible because her reports of her

activities of daily living (ADL) were not fully supported by the objective findings.  R. 411.

On November 9, 2010, Jones saw Voelker.  Voelker administered subacromial bursa injections and trigger point injections to relieve pain.  R. 417-23.  On December 6, 2010, Jones notified her physical therapists that she was told to discontinue the physical therapy because she had a rotator cuff tear.  R. 358.

On December 10, 2010, Jones saw Dr. Waheed for right shoulder pain.  An MRI showed a partial tear in the rotator cuff, tendinosis, and degenerative changes in the AC joint.  R. 371.  Dr. Waheed referred Jones to an orthopedist.  On January 7, 2011, and January 11, 2011, Jones saw a Physician's Assistant working under orthopedist Dr. George Crickard, M.D.  Jones saw a different Physician's Assistant at each visit.  The Physician's Assistants recommended against surgery because Jones had significant uncontrolled pain.  Jones was given a home exercise program.  R. 505-09.

On February 10, 2011, Jones saw a pain management specialist, Dr. Joseph Meyer, M.D.  Jones reported "excruciating pain" in her shoulder, back, hips, and knees.  Jones reported pain in all of her joints.  Her pain was 4 out of 10 at rest and 9 out of 10 during any activity.  Dr. Meyer noted that a January 2011 MRI showed some degenerative changes in her back.

Dr. Meyer also noted the results of the December 2010 MRI of Jones'
shoulder.  Dr. Meyer adjusted her pain medication and recommended a
psychiatric evaluation.  R. 538.

On March 2, 2011, state agency psychologist Dr. Leslie Fryans,
Ph.D., reviewed the medical records and affirmed the opinions of Dr. Mehr.
R. 431.

Also on March 2, 2011, state agency physician Dr. George Andrews,
M.D., prepared a Physical Residual Functional Capacity Assessment of
Jones.  R. 433-40.  Dr. Andrews opined that Jones could lift twenty pounds
occasionally and ten pounds frequently; stand and/or walk for six hours in
an eight-hour workday; and sit for about six hours in an eight-hour workday.
Dr. Andrews commented that Jones was limited to light work due to rotator
cuff tear.  R. 434.

Dr. Andrews opined that Jones could occasionally climb ramps and
stairs; never climb ladders, ropes, and scaffolds; occasionally balance,
stoop, kneel, crouch, and crawl.  Dr. Andrews opined that Jones was
limited in reaching in all directions with her right arm due to the rotator cuff
tear.  R. 436.  Dr. Andrews opined that Jones should avoid concentrated
exposure to extreme heat and hazards.  R. 437.  Dr. Andrews concluded,

> [T]he above individual is restricted to light work activity with the
> above limitations due to partial tear of the right rotator cuff and

fibromyalgia.  The claimant's symptoms and alleged functional limitations have been consistently described throughout the case record.  The examining source's opinions are consistent with the residual functional capacity determined in this decision.  The allegations are credible.

R. 440.

On March 14, 2011, Jones went to the Mental Health Centers of Western Illinois (MHCWI) for an evaluation.  R. 450-56.  The outpatient counselor diagnosed Jones with alcohol dependence, cannabis abuse, and major depressive disorder, recurrent.  R. 456.

On April 21, 2011, Jones saw psychiatrist Dr. Philip I. Woerner, M.D., at MHCWI for a psychiatric evaluation.  Dr. Woerner assessed Jones with major depressive disorder with anxiety and agitation.  Dr. Woerner assigned Jones a GAF score of 54.  Dr. Woerner adjusted her medications.  R. 471.

Commencing in May 2011, Jones received periodic trigger point injections for pain.  Jones reported continuing problems with ongoing pain.  R. 547, 549, 559, 562, 566, 568.

On June 13, 2011, Jones's mother Judith Jones completed a questionnaire about Jones.  R. 241-43.  Judith Jones stated that she believed Jones could not work.  Judith Jones stated, "Lisa needs to rest frequently & is often in pain.  She also becomes depressed & has anxiety

problems.  Her ability to interact with people is lacking."  R. 241.  Judith

Jones stated that she observed Jones experiencing pain in her shoulder,

back, and leg.  Jones often had to sit or lie down.  Judith Jones stated,

"Standing & sometimes walking can be a problem because her leg may

'buckle' & not support her."  R. 241.  Judith Jones stated that Jones's ability

to function varied from day to day depending on the level of pain Jones was

experiencing.  Judith Jones stated, "Doing anything with her shoulder can

limit her ability to function."  R. 242.  Judith Jones stated that Jones tried to

avoid interacting with people.  Judith Jones stated that she observed Jones

appearing stressed four to five times a week.  Judith Jones stated, "Lisa

writes everything down & keeps lists & calendars so this does not happen.

She is obsessive & compulsive in organizing her life's activities."  R. 243.

Dr. Woerner saw Jones regularly thereafter beginning in April 2011

throughout the rest of 2011 and the first half of 2012.  His diagnosis

consistently showed a major depressive disorder, and also included

substance abuse after October 2011.  Dr. Woerner assigned Jones GAF

scores that varied from 44 to 58.  R. 467, 465, 463, 461, 460.  On April 23,

2012, a counselor working with Dr. Woerner assigned Jones with a GAF

score of 49.  R. 462.

On August 17, 2012, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Jones appeared in person and with her counsel. Vocational expert Susan Shea also appeared by telephone.

Jones testified that she was divorced, and she lived in a house with her two children ages 19 and 6.  She last worked in January 2010 as a dietician and food service supervisor at a hospital.  She was terminated for lack of attendance.   She took a six to eight week leave of absence due to her pain and depression, and did not return.  R. 48-49.

Jones testified about her pain.  She described her pain as beginning in her right shoulder and going into her neck, lower back, and left hip.  She testified that she had difficulty standing.  She needed frequent rest periods in which she had to lie down to relieve pain.  Jones testified that she had fourteen trigger points for pain.  One of the fourteen was below the waist. Jones testified that she received trigger point injections quarterly.  R. 50-51.

Jones testified that she had difficulty using her shoulders in repetitive motions due to her neck pain.  She testified that the neck pain caused headaches about once a week.  The headaches lasted two to three hours with medication.  She testified that she lay down and rested in bed when she got a headache.  R. 51.

Jones testified that she could not perform repetitive actions with her right arm due to the rotator cuff tear. She testified that she could only use her right arm for five minutes due to this limitation. After five minutes' use, she had to rest her arm for thirty minutes. As a result, she had difficulty using a blow dryer, taking a shower, and cooking. R. 52. Jones testified that she could only lift ten pounds with her right arm, and could not do that repetitively. R. 53.

Jones testified that she had constant back pain. She testified that the pain increased with fatigue. She testified that rest lessened the pain, but did not completely relieve the pain. She testified that she lay down four hours a day to rest during the day. R. 53. She also took several pain medications. R. 53-54.

Jones testified that she should sit for an hour at a time for a total of two to three hours in an eight-hour workday. She could stand for a total of two to three hours in an eight-hour workday. She testified that she would need to lie down for the remainder of an eight-hour workday. R. 54-55.

Jones testified that she had no energy due to her fatigue. She testified that she could focus on a task or a repetitive action for thirty minutes to an hour because of her fatigue. After spending thirty minutes to an hour on a task, she needed lie down or sit and rest. R. 55. Jones

testified that she also experienced excruciating pain if she engaged in a repetitive task for an hour.  R. 56.

Jones testified that she took medication for her depression.  She testified that the medication stabilized her mood.  R. 56.  She testified, "I just wish that [the antidepressant medication] would lift my mood and make me feel more happy, even more motivated because I think some of my depression, because of the pain, limits my activities."  R. 56.

Jones testified that she engaged in OCD behaviors when she was in extreme depression,

> When I'm in extreme depression that's kind of the only method that I have to control my life.  I have some rituals of checking things, starting one room of the house and go through the house in a certain pattern.  Making sure pictures are straight, towels are folded.  Even when I was working at the last job, I did that in my workplace too.

R. 57.

Jones testified that her medications caused nausea and vomiting three to four times a week.  She testified that she vomited one to three times a day during these events.  R. 57-58.  She testified that she took Ultram five days a week and Vicodin once a week.  She testified that the Vicodin made her feel tired.  R. 60.

Jones testified that she took care of her personal hygiene.  She could dress herself, but she sometimes had difficulty with socks or pants,

depending on the severity of the pain in her hips.  She testified that she
slept in her clothes to insure that she would be able to be dressed in the
morning.  She testified that she sometimes wore the same clothes three
days in a row without changing or bathing.  R. 58.  Jones testified that
sometimes she could not sleep at night, but other times she slept twelve
hours in a row.  R. 58-59.

Jones testified that she went to church on Sundays.  The services
lasted about an hour and a half.  Jones usually had to change positions
during the service, and she left during the service to walk to the restroom
and back.  R. 59-60.

Jones testified about her substance abuse.  She testified that in 2010,
she drank a half a gallon of vodka a day.  She testified that she started
seeing a substance abuse counselor.  She testified that at the time of the
hearing she drank about once a month socially.  At those times, she drank
two shots of vodka.  R. 61.  She testified that she also smoked marijuana
socially.  She last smoked marijuana in March 2012.  R. 62.  Jones testified
that her alcohol use did not play a role in her depression.  R. 64.  Jones
testified that her doctors advised her to stop drinking and using marijuana.
R. 65.  Jones testified that she did not drink or use drugs while was working

in the past.  R. 67.  Jones testified that she experimented with cocaine one
time.  R. 68.

Jones testified that she had good days and bad days with her
depression.  She testified that she had two to three good days a week and
four bad days a week.  During good days, she did household chores and
showered.  During bad days, she cried because of her pain and did not do
anything; she did not shower.  R. 63.

Jones testified that the last two fingers in her left hand are numb.
She testified that she saw a hand surgeon.  He prescribed a brace at night
for six weeks, but believed Jones would need surgery.  R. 69.  Jones'
attorney stated that the record would be supplemented with the records
from the hand surgeon.  R. 69.

Vocational expert Shea then testified.  Shea testified that Jones
previously worked as a food service supervisor, dietician, and restaurant
manager.  R. 70-71.

The ALJ asked Shea the following hypothetical question:

Assume an individual the claimant's age, education and work
experience who is limited to the full range of light exertional
work as defined in the regulations.  Limited to frequent right arm
pushing and pulling, frequent climbing of ramps and stairs, no
climbing of ladders, ropes or scaffolds.  Occasional stooping,
kneeling, crouching, and crawling.  Limited to reaching in all
directions with the right arm no more than frequently.  Limit to
frequent.  Must avoid concentrated exposure to extreme heat,

concentrated exposure to hazards such as operational control
of moving machinery and unprotected heights.  Limited to
simple, routing, and repetitive tasks.  No more than occasional
changes in the work setting.  No production rate or pace work,
that is no strict or fast-paced productions requirements,
although competitive production requirements would still exist.
No interaction with the public, superficial interaction with co-
workers.  Could such an individual return to any of the past
work you testified to?

R. 71-72.  Shea opined that such a person could not perform Jones's past

work.  R. 72. Shea opined that such a person could perform other jobs that

exist in the national economy, including light cleaner, housekeeper, with

4,500 such jobs in Missouri and 300,000 nationally; light machine tending,

with 7,000 such jobs in Missouri, and 470,000 nationally; assembly work,

with 5,500 such jobs in Missouri and 200,000 nationally.  R. 72.  Shea

opined that the listed jobs were just a sample of the jobs that could be

performed by the person described in the hypothetical question.  R. 72.

The ALJ then modified the hypothetical question:

We're going to take the hypothetical one and make some
changes.  We're going to take . . . climbing of ramps and stairs
down to occasional.  We're going to take right arm pushing and
pulling down to occasional.  We're going to take reaching in all
direction with the right arm down to occasional.
. . . .
We're going to add left hand handling and fingering limited to
frequent.  Those are all the changes we're making.  Are these
any jobs in the national economy for such an individual?

R. 73.  Shea opined that no jobs would be available for such a person.

Shea opined that the limitation on reaching would preclude most unskilled

work.  R. 73.

The ALJ then concluded the hearing.   The ALJ left the record open

for fourteen days after the hearing to allow Jones to submit additional

evidence.  R. 44, 69.

On August 20, 2012, Dr. Woerner prepared a form entitled "Medical

Source Statement of Ability to Do Work-Related Activities (Mental)."

R. 532-34 (Medical Source Statement).  The Medical Source Statement

called for Dr. Woerner to rate the mental limitations of Jones to perform

certain work-related functions on a scale of None, Mild, Moderate, Marked,

and Extreme.  The Medical Source Statement defined Marked as:

> There is a serious limitation in this area.  There is a substantial
> loss in the ability to effectively function.  An assessment of
> Marked means the impairment will interfere with the individual's
> ability to perform work-related activities thirty to fifty percent of
> the time.

R. 532.

Dr. Woerner opined that Jones had marked limitations on her ability

to interact appropriately with the public, supervisors, and coworkers; and

moderate limitations on her ability to respond appropriately to work

situations and changes in routine.  Dr. Woerner could not opine on effects

of Jones's mental impairments on her ability to understand and remember

instructions or to make work-related decisions.  Dr. Woerner opined

Jones's problems with substance abuse did not contribute to the limitations

in her functional abilities.  R. 532-33.  On August 24, 2012, Jones

submitted Dr. Woerner's Medical Source Statement to the ALJ.  R. 531.

THE DECISION OF THE ALJ

The ALJ issued his decision on October 25, 2012.  R. 21-34. The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant

to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Jones met her burden at Steps 1 and 2.  The ALJ found that Jones had not engaged in substantial gainful activity since her alleged onset date of January 15, 2010, and Jones suffered from severe impairments of major depressive disorder; personality disorder; panic disorder with agoraphobia; alcohol abuse; marijuana abuse; obesity; fibromyalgia; history of right rotator cuff tear and osteoarthritis in the right

shoulder; history of cervical spondylosis; history of lumbar spondylosis with disc herniation and severe canal stenosis; degenerative disc disease; and status post back surgery.  R. 23.  The ALJ found at Step 3 that Jones did not have an impairment or combination of impairments that met or equaled a Listing.  R. 25.

At Step 4, the ALJ found that Jones had the RFC to perform light work limited to frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling.  The ALJ further found that Jones's RFC required her to avoid concentrated exposure to extreme heat and hazards such as operational control of moving machinery and unprotected heights; and further limited her to simple, routine, repetitive tasks, occasional changes in work settings, no production rate or pace work, no interaction with the public, and only superficial interaction with coworkers.  R. 26-27.  The ALJ relied on the opinions of Drs. Froman, Bilinsky, Andrews, Mehr, and Fryans in reaching his findings.  R. 31-32.[1]  The ALJ disagreed with Drs. Andrews and Bilinsky in one respect.  The ALJ found that Jones could frequently climb ramps and stairs because, "There is no evidence in the record of gait instability, the need for use of a cane, or limitation of range of

---

[1] The ALJ did not mention the doctors and psychologists by name, but referred to them as "State Agency" doctors and psychologists.  The ALJ also identified their opinions by the record reference designations, 10F, 11F, 12F, 14F, and 15F.  R. 31, 32.

motion."  R. 32.  The ALJ further found that Jones's claims of the severity of her symptoms was not credible.  The ALJ relied on the medical opinions, the level of Jones's daily activities, and the lack of her use of mental health services to support this opinion.  The ALJ stated that her mental conditions were effectively treated with medications and "her psychiatric evaluations reveal good mood with only minor exacerbations."  R. 31.

The ALJ gave little weight to Dr. Woerner's opinions set forth in the Medical Source Statement.  The ALJ noted that the definition of "marked" in the Medical Source Statement differed from the definition in the Social Security regulations.  Claimant's counsel prepared a Medical Source Statement specifically for the Claimant, which included definitions of the categories of "mild, moderate, marked, and extreme" .  The definitions created by counsel for each category included specific percentages of time during which the Claimant could not perform work related activities. (Claimant's Brief in Support of Motion for Summary Judgment , d/e 11, pg 11) R. 532-534.   Those definitions do not conform with the definitions of the same terms as defined by the Social Security Administration.  The ALJ also found that the finding of marked limitations in interacting with the public, coworkers, and supervisors was inconsistent with Dr. Woerner's own treatment notes, the opinions of Drs. Froman, and the records from

MHCWI and other medical records.  The ALJ found that this other evidence supported a finding of moderate limitations.  R. 32.

The ALJ treated the questionnaire completed by Jones's mother Judith Jones as opinion evidence from a source other than an acceptable medical source.  The ALJ found that Judith Jones's opinions were inconsistent with the record as a whole and not well supported by the evidence.  R. 32.

The ALJ found at Step 4, considering Jones's age, education, experience, and RFC, that she could not return to her prior work as a food service manager, dietician, or restaurant manager.  The ALJ relied on the RFC finding and the opinions of vocational expert Shea.  At Step 5, the ALJ found that Jones could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of Shea that Jones could perform several jobs that exist in significant numbers in the national economy, such as cleaner, machine tending, and assembly work.  R. 33. The ALJ concluded that Jones was not disabled at Step 5.  R. 33-34.

Jones appealed the decision of the ALJ.  On March 13, 2014, the Appeals Council denied her request for review.  The decision of the ALJ

then became the final decision of the Commissioner.  R. 1.  Jones then

brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ failed to build an accurate and logical bridge from the

evidence to his conclusion.  The ALJ gave great weight to the opinions of

the state agency physicians and psychologists, including Dr. Andrews.

Dr. Andrews, however, opined that Jones was limited in reaching with her right arm due to her rotator cuff tear.  R. 436.  The ALJ put no limitation in Jones's RFC for reaching with her right arm and did not explain the inconsistency with Dr. Andrews's opinions.[2]  This inconsistency is significant because vocational expert Shea opined that no jobs would be available for a person's with Jones' age, education, and work experience, and with the ALJ's RFC finding, if her ability to reach was limited to occasional.  R. 73.

The Court cannot tell whether the ALJ considered Dr. Andrews's opinion regarding Jones's limitation on reaching with her right arm when the ALJ formulated the RFC.  The Court, further, cannot tell whether the ALJ considered Dr. Andrews's opinion when assessing vocational expert Shea's opinions that no jobs would be available to a person with Jones's relevant characteristics who was limited to occasional reaching with her left arm.  In light of these unanswered questions, the matter must be remanded to the ALJ for further proceedings.

On remand, the ALJ should also more thoroughly analyze the effect of Jones's fibromyalgia on her functional limitations in accordance with SSR 12-2p.  The ALJ acknowledged that Jones had fibromyalgia, but did

---

[2] Dr. Bilinsky did not consider the rotator cuff tear in her opinions because she rendered her opinions in October 2010 before the tear developed.  Jones first complained about the right shoulder pain in December 2010.

not sufficiently address the effects of fibromyalgia throughout the Analysis. <u>See</u> SSR 12-2p, § IV(B).

The Court sees no error with the ALJ's decision to give Dr. Woerner's opinion little weight.  Dr. Woerner's opinions in the Medical Source Statement were of little value since the Medical Source Statement did not use the Social Security regulations' definition of the scale of "none," "mild," "moderate," "marked," and "extreme."  Counsel for Jones should secure opinions that use terms consistently with definitions in the regulations.

Finally, on remand, the ALJ should address the evidence from Jones's mother, Judith Jones, as factual evidence from a non-medical source, rather than as opinion evidence.  The questionnaire Judith Jones completed generally asked her to describe her observations of Jones, not her opinions.  R. 241-43.  The ALJ should consider such evidence in accordance with the regulations and applicable rulings.  For example, the Social Security Policy Interpretation Ruling on Evaluation of Fibromyalgia, SSR 12-2p, states, in part:

> [I]nformation from nonmedical sources can also help us
> evaluate the severity and functional effects of a person's
> [fibromyalgia].  This information may help us to assess the
> person's ability to function day-to-day and over time.  It may
> also help us when we make findings about the credibility of the
> person's allegations about symptoms and their effects.
> Examples of nonmedical sources include:  (a) . . . relatives . . . .

SSR 12-2, §III(B)(2); see 20 C.F.R. § 404.1513(d)(4); see also SSR 96-7p. The ALJ should address the evidence from Judith Jones accordingly.

THEREFORE, this Court recommends that Jones's Brief in Support of Motion for Summary Judgment (d/e 11) should be ALLOWED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) should be DENIED.  The decision of the Commissioner should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:  October 9, 2015

_____s/ Tom Schanzle-Haskins_____
UNITED STATES MAGISTRATE JUDGE